UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

WALTER RAPOSO and JOSEPH MINGOLLA,
On behalf of themselves and all
Others similarly situated,

                          Plaintiffs,

                  v.

GARELICK FARMS, LLC,

                          Defendant.

**C.A. No.:  11-cv-11943**

## DEFENDANT GARELICK FARMS, LLC'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Plaintiffs, former truck drivers employed by Garelick Farms, LLC ("Garelick Farms" or "Defendant"), bring this putative class action alleging violations of the Massachusetts Wage Act and common law unjust enrichment.  Specifically, Plaintiffs complain that they were not compensated for missed meal and rest periods, in violation of the Massachusetts Wage Act. Through the instant motion, Plaintiffs ask this Court to certify a class pursuant to Fed. R. Civ. Pro. 23(b)(3) comprising hundreds of delivery drivers employed across the Commonwealth of Massachusetts over the past six years alleging unpaid meal breaks in violation of the Massachusetts Wage Act and common law.  Garelick Farms hereby submits its Opposition to that Motion.

As set forth below, Plaintiffs' proposed class would be comprised of current and former drivers from two completely separate and different facilities, who were subject to different policies and practices, over a lengthy period of time,[1] and who drove very different delivery

---

[1] Garelick disputes Plaintiffs' claim that they can maintain both a claim under the Wage Act and a common law claim for unjust enrichment.  Where, as here, a suitable remedy at law exists, there is no need to invoke equitable remedies. *See Spears v. Miller*, 2006 Mass. App. Div. 151 (2006) (finding that where an adequate remedy at law exists, a plaintiff may not pursue a claim of unjust enrichment); *Popponesset Beach Ass'n v. Marchillo,* 39 Mass.

routes and maintained different daily routines under different supervisors.  It is Plaintiffs' burden

to prove that it would promote judicial economy to adjudicate their claims as a class in one

proceeding.  But, Plaintiffs' theories that (i) a driver actually works (*i.e.*, performs his job duties)

during his meal break, and that (ii) on any given day a driver is so "restricted" as to his meal

break activities that his meal period is actually compensable, are not capable of class

adjudication.  Indeed, the only consistency between putative class members in this case is that

workers are expected to take a 30-minute meal break, and 30-minute meal breaks are

automatically deducted from each driver's shift.  As set forth below, there is tremendous

variability in the actual day-to-day meal break practices of even the named Plaintiffs, much less

those of the hundreds of other drivers in the putative class reporting to different supervisors at

different facilities.  In addition, the named Plaintiffs, hold interests that directly conflict with the

interests of other putative class members, making them inadequate class representatives.

For these reasons, Plaintiffs cannot satisfy the commonality, typicality and adequacy

requirements of Rule 23(a), particularly in light of the Supreme Court's recent decision in *Wal-*

*Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), nor can they meet the predominance and

superiority requirements of Rule 23(b)(3).  Plaintiffs' Motion for Class Certification thus must be

denied.

## STATEMENT OF FACTS[2]

### *General Background*

Garelick Farms' two facilities in Massachusetts – one in Franklin and the other in Lynn –

are operated and managed independently of one another; each employs its own delivery drivers,

---

App. Ct. 586, 591 (1996) (finding where plaintiff has suitable remedy at law, there is no occasion to invoke equitable remedy of unjust enrichment).  In any event, even if Plaintiffs can proceed with their unjust enrichment claim, a three year and not a six year statute of limitations would apply to their claim because their claim sounds in tort.  *See Cannonball Fund, Ltd. v. Dutchess Capital Mgmt.*, 29 Mass. L. Rptr. 305 at *5 (Super. Ct. 2011); *see also Crocker v. Townsend Oil Co., Inc.*, 464 Mass. 1 *10-12 (2012) (analogizing Wage Act claims to tort claims).

[2] All exhibits referenced herein are annexed to the Declaration of Diane Saunders, dated April 8, 2013 and filed in support of Defendant's Opposition to Plaintiffs' Motion for Class Certification.

supervisors, Human Resources personnel and Distribution Manager.   While the Franklin and Lynn facilities follow Garelick Farms company policies, they also have adopted and use their own specific policies and procedures unique to each location.   Ex. C, Deposition of Keith Murphy ("Murphy Dep.") at 21:7-22:18.

Plaintiffs Joseph Mingolla and Walter Raposo never worked in the Lynn facility, nor are they familiar with the operations there or policies in effect for drivers who worked out of the Lynn facility.   Ex. B, Deposition of Joseph Mingolla ("Mingolla Dep.") at 69:24-71:14 ("I have no idea" whether Lynn had a driver security policy, handbook, or whether Lynn drivers were required to keep their trucks in their sight); Ex. D, Deposition of Walter Raposo ("Raposo Dep.") at 45:19-21, 99:14-21.   Mingolla worked as a driver for Garelick Farms until January 1, 2011, when he became a supervisor.   Ex. B, Mingolla Dep. at 33:14-18.

Drivers' routes varied depending on whether they worked out of the Franklin or Lynn facility.   Ex. B, Mingolla Dep. at 70:9-21 (Lynn handled more institutional accounts, such as restaurants and hospitals, while Franklin for the most part handled retail accounts, such as supermarkets and box stores).   Drivers' routes also constantly changed based on the marketplace, changes in customers, and changes in volume and demand.   Ex. B,  Mingolla Dep. at 72:6-74:12; 149:8-150:5; Ex. D, Raposo Dep. at 49:7-20, 51:14-52:11.   Other variables also impacted the way a route would run, such as traffic, bad weather, and number of stops.   Ex. B,  Mingolla Dep. at 150:6-151:8 ("So there's just an endless list of variables that could affect how your particular day went, and you would basically have to, you know, fight your way through the obstacles."); Ex. D, Raposo Dep. at 48:21-49:6, 49:12-51:13.   A driver's day also could be dramatically affected depending on the supervisor who structured the route for that day.   Ex. B, Mingolla Dep. at 151:15-152:9, 153:14-20 ("So unfortunately, you know, the routes were not always set up by

the same individual.  It varied greatly, and the style from each one of these individuals would vary greatly, therefore, that would affect what was or what was not on a particular route on any particular day.").  In the case of Plaintiff Raposo, his days also varied in that he served certain groups of stores on one day, and a completely different set of stores the next day.  Ex. D, Raposo Dep. at 45:22-46:15, 47:20-48:20.

### *Garelick's Meal and Rest Period Policies and Practices*

Garelick Farms company policy clearly provides that drivers are to be given two paid 15-minute breaks and one unpaid 30-minute meal break per shift.  Ex. E, Garelick Farms Employee Handbook at 20.  Beginning in 2011, the Lynn facility promulgated its own policy whereby drivers are to be given a total of 30 minutes of compensated break time and one unpaid 30-minute meal period per shift.  Ex. C, Murphy Dep. at 22:19-23:20.  In order to account for the unpaid 30-minute meal break, thirty minutes is automatically deducted from every shift worked.  Ex. B, Mingolla Dep. at 21:1-13, 22:15-18.

Drivers are regularly told by supervisors that they must take their breaks.  Ex. B, Mingolla Dep. at 122:3-6 ("we were constantly told to – and I quote – 'take your break'"), 133:9-23.  Drivers were never told not to take their meal breaks.  Ex. B, Mingolla Dep. at 177:19-22 ("I was specifically told to take my meal break.").  Because of the independent nature of their job – driving a truck alone on a set route – drivers had complete discretion in scheduling their meal breaks. Ex. C, Murphy Dep. at 19:10-13.  No one tells drivers what time they are supposed to take a break, and when drivers take breaks varies from driver to driver.  Ex. B, Mingolla Dep. at 186:2-7; Ex. D, Raposo Dep. at 28:23-29:19 (his own system for taking breaks was that because of his route, he would take his break at the end of his day, but others had other systems and would take breaks in the middle of the day), 30:10-18.

Drivers at the Franklin facility may break up their 60 minutes of break time per shift into whatever increments they prefer.  Ex. B, Mingolla Dep. at 22:19-24:2 (Mingolla followed this practice as a driver, and later enforced this practice as a supervisor at the Franklin facility), 120:20-121; Ex. A, Deposition of Scott Brown ("Brown Dep.") at 30:7-21.  Beginning in 2011, however, the Lynn facility instituted its own separate policy under which drivers may not combine their two 15-minute breaks with their 30-minute meal break.  Ex. F, Garelick Farms of Lynn Break and Lunch Policy; Ex. C, Murphy Dep. at 15:8-10.  Drivers at Lynn also must separate their breaks by at least 90 minutes, when possible.  See Ex. G, Lynn Break and Lunch Policy; Ex. C, Murphy Dep. at 29:16-21.  Other than this guideline, drivers at Lynn are able to schedule their meal periods at their discretion.  Ex. C, Murphy Dep. at 19:10-17.

Prior to filing of this lawsuit,[3] the procedure in Franklin for drivers who were not able to take their breaks was to communicate to their supervisor, who then was to make sure they were compensated for the break.  Ex. A, Brown Dep. at 36:9-14, 37:18-38:2.  The procedure in Lynn for drivers who reported that they were unable to take a break was that supervisors would review the driver's route, and if warranted, would allow the driver to take extra break time later in the week.  Ex. C, Murphy Dep. at 44:10-16, 45:1-15.

Garelick Farms has few, if any, policies which restrict drivers' activities while on break.  There are no restrictions against drivers reading, using their cell phones, resting in their vehicle, or meeting up with others while taking a break.  Ex. B, Mingolla Dep. at 174:17-175:11; 177:14-18; Ex. D, Raposo Dep. at 75:10-76:18; Ex. C, Murphy Dep. at 31:12-16 ("Our policy is, you are free to do whatever it is you would like to do.").

---

[3] As Plaintiffs correctly note, subsequent to the filing of this suit, Garelick formalized this process into a written waiver form. *See* Doc. 49 at p. 5, n. 5 (providing record citations).

The Franklin facility has a guideline that drivers should *try* to keep their vehicles in sight when parked for meals.  Ex. H, Dean Foods Driver's Security Policy; Ex. A, Brown Dep. at 30:22-31:11, 32:12-33:7.[4]   During the relevant time period beginning in 2008, however, no drivers were disciplined for failing to keep their truck in sight while taking a meal or other break. Ex. B, Mingolla Dep. at 40:21-41:24.   The Lynn facility has no such guideline or policy requiring drivers to keep the vehicle in sight or maintain contact with the vehicle.   Ex. C, Murphy Dep. at 31:17-21; 32:7-9.   Both the Franklin and the Lynn facilities have policies whereby drivers are expected not to go "off route" to take their breaks.  Ex. A, Brown Dep. at 28:4-11; Ex. C, Murphy Dep. at 31:22-32:4.   Other than not going off route, there are no constraints on where a driver may take a break.  Ex. A, Brown Dep. at 30:4-6.

Numerous drivers for Garelick Farms – both at the Franklin and Lynn facilities – have stated that they always or usually take their 30-minute meal break.  Ex. I, Declaration of Walter Almeida ("Almeida Dec.") ¶ 9; Ex. J Declaration of Thomas Craib ("Craib Dec.") ¶ 7; Ex. K, Declaration of Richard Gill ("Gill Dep.") ¶ 16; Ex. L, Declaration of Wayne Haringa ("Haringa Dec.") ¶¶ 7, 12; Ex. M, Declaration of Roland Kneeland ("Kneeland Dec.") ¶ 14; Ex. N, Declaration of Dean Marcone ("Marcone Dec.") ¶ 6; Ex. O, Declaration of Gerardo Rivera ("Rivera Dec.") ¶ 7; Ex. P, Declaration of Nelson Santos ("Santos Dec.") ¶¶10-11; Ex. Q, Declaration of Neil Stanley ("Stanley Dec.") ¶ 9; Ex. R Declaration of Brian Walker ("Walker Dec.") ¶ 7.  Even Plaintiffs admit that there were at least some occasions on which they took a meal break.  Ex. B, Mingolla Dep. at 124:24-125:14; Ex. D, Raposo Dep. at 14:5-15, 14:23-15:6 (qualifying that he would never take the entire 30 minutes).   Interestingly, Plaintiff Mingolla's personal preference was not to eat a meal during the course of his work day, other than coffee

---

[4] Notably, this guideline states that drivers should *try* to keep their vehicle in sight, not that they actually must keep the vehicle in sight.

and snacks, and rarely would eat a meal during the course of his day.  Ex. B, Mingolla Dep. at 189:11-190:11.

Some drivers take a series of smaller breaks, while other drivers lump their breaks into one 60-minute break.  Ex. I, Almeida Dec. ¶ 9; Ex. J, Craib Dec. ¶¶ 12-13; Ex. K, Gill Dec. ¶¶13, 15-16; Ex. M, Kneeland Dec. ¶ 12; Ex. O, Rivera Dec. ¶¶ 12-14; Ex. P, Santos Dec. ¶ 9; Ex. Q, Stanley Dec. ¶ 9; Ex. R, Walker Dec. ¶¶ 11-12.  In addition, some drivers skip their 30-minute meal breaks in order to go home early.  Ex. B, Mingolla Dep. at 187:22-188:8 (Plaintiff Mingolla may have skipped breaks on occasion so that he could get home earlier or to an appointment); Ex. J, Craib Dec. ¶ 15; Ex. K, Gill Dec. ¶ 18; Ex. M, Kneeland Dec. ¶ 15; Ex. O, Rivera Dec. ¶ 16; Ex. P, Santos Dec. ¶ 11; Ex. R, Walker Dec. ¶ 14.  Drivers take their breaks during different times during the day, and spend their breaks in a variety of ways, including sitting in their truck while resting, talking on the phone or reading, sleeping in their truck, eating, stopping for coffee, or using the restroom.  Ex. I, Almeida Dec. ¶ 9; Ex. J, Craib Dec. ¶ 14; Ex. K, Gill Dec. ¶¶ 13, 15-16; Ex. L, Haringa Dec. ¶ 13; Ex. M, Kneeland Dec. ¶ 14; Ex. N, Marcone Dec. ¶¶ 8-9; Ex. O, Rivera Dec. ¶ 15; Ex. P, Santos Dec. ¶ 9; Ex. Q, Stanley Dec. ¶ 9; Ex. R, Walker Dec. ¶ 13.

### *Garelick's XATANET System*

XATANET is a system used by Garelick Farms for the purpose of tracking the movements of vehicles, planning routes, complying with Department of Transportation ("DOT") safety regulations, and tracking certain metrics – such as miles per gallon, idling time, use of delay codes, etc. – among other things.  Ex. D, Raposo Dep. at 78:1-11; Ex. B, Mingolla Dep. at 118:14-23; Ex. A, Brown Dep. at 43:11-44:10, 47:18-23, 74:9-75:3; Ex. C, Murphy Dep. at 48:20-49:2.  XATANET is not used by Garelick Farms management to track breaks for payroll

purposes or to ensure that drivers are abiding by the break policy.  Ex. A, Brown Dep. at 39:7-21, 78:13-19; Ex. C, Murphy Dep. at 29:22-30:13.

Depending on the location out of which they work and their supervisor, drivers are given varying direction as to how to enter codes or breaks into XATANET.  At the Lynn facility, beginning in 2011, drivers were instructed that they should record all breaks and meals in XATANET "whenever possible" or "when reasonable."  Ex. G, Lynn Break and Lunch Policy; Ex. C, Murphy Dep. at 15:2-7.  The Franklin facility does not have a policy in effect regarding logging breaks into XATANET, but does encourage its drivers to enter break codes and other delay codes.  Ex. A, Brown Dep. at 42:17-22, 43:3-10, 93:21-22 (because some drivers use the delay codes and others do not, the lack of consistency in XATANET records could be recorded in various ways).  Plaintiff Mingolla testified that he was instructed to punch in "something" if his vehicle was stopped for more than seven minutes.  Ex. B, Mingolla Dep. at 118:2-9, 121:16-123:5.[5]  Drivers at Lynn were not given any such instruction, however.  Ex. C, Murphy Dep. at 57:12-58:20.

Depending on whether they were instructed by supervisors to enter a code into XATANET if their truck was stopped, as well as their own personal preferences, drivers may have logged the code for "break" into XATANET even if they were not on a break but performing work while the truck was stopped, such as loading up the back of the truck.  Ex. B, Mingolla Dep. at 121:16-123:5, 126:3-127:5, 127:11-13 ("Q: So are you saying that drivers would press 'break' when they weren't taking breaks? A. Absolutely."), 127:17-19 ("Q: Let's talk about you, for instance.  Would you press 'break' and then keep working?  A. Absolutely.");

---

[5] Significantly, supervisors simply told drivers to enter "something" or "any type of delay" if they were stopped, and did not tell drivers to enter the code for break if they were not on break.  Ex. B, Mingolla Dep. at 118:2-9, 122:18-123:5, 126:3-9; Ex. D, Raposo Dep. at 9:21-10:3, 12:22-13:6.

Ex. D, Raposo Dep. at 9:21-10:6 ("So I started hitting the breaks, but technically I was working."), 14:5-15.   Under the XATANET system, it also would be possible for a driver to drive to a location on his route, turn off the truck and take a break, but record the break as a "delivery" rather than as a break.   Ex. B, Mingolla Dep. at 173:9-18 (in such a situation, there would be no way for anyone to know what the driver was actually doing).

In addition, according to Plaintiffs, it was a common occurrence that drivers took a break, but did not enter a break code into XATANET while doing so.   Ex. B, Mingolla Dep. at 166:20-167:13 (admitting that he and others would not enter a break code when stopping for coffee if they could get back on the truck and get it moving within seven minutes); Ex. D, Raposo Dep. at 87:19-88:1 (admitting that he would stop to get coffee without logging a break); *see also* Ex. I, Almeida Dec. ¶ 12 (sometimes makes up missed meal breaks by taking a break near the loading docks of one of stops and XATANET still shows the time as working time and not as break);. Drivers, including Plaintiffs, also may have taken breaks but forgotten to log them, Ex. B, Mingolla Dep. at 168:6-9; Ex. D, Raposo Dep. at 85:20-23, or mis-logged breaks by hitting the wrong button, Ex. B, Mingolla Dep. at 168:21-23.

Drivers use different practices when logging breaks into XATANET, and do not always log breaks the way that breaks were taken.   Ex. I, Almeida Dec. ¶ 12 (often logs breaks into XATANET separately, even if he takes them all at one time, and also sometimes makes up missed meal breaks by taking a break near the loading docks of one of stops even though XATANET still records his time on break as working time); Ex. J, Craib Dec. ¶¶ 11-13 (does not log morning coffee breaks into XATANET, sometimes codes long, 60-minute break as "lunch" but other times codes it as "break"); Ex. K, Gill Dec. ¶¶ 13-14 (does not log six coffee stops per day as breaks, sometimes has coded "breaks" as "lunches" or vice versa); Ex. M, Kneeland Dec.

¶¶ 12-13 (sometimes coded long breaks as "lunch or meals," other times coded it as "break"); Ex. N, Marcone Dec. ¶ 11 (sometimes codes breaks of less than 30 minutes as "lunch" and breaks of 30 minutes or more as "breaks"); Ex. O, Rivera Dec. ¶ 11 (does not log coffee stops that take five to seven minutes, uses "lunch" and "break" codes interchangeably); Ex. Q, Stanley Dec. ¶ 12 (logs breaks separately, even if takes all of them together, does not long frequent coffee breaks as breaks); Ex. R, Walker Dec. ¶¶ 11-12 (has used "break" and "lunch" codes interchangeably, regardless of length of break).

The XATANET system is regarded by Plaintiffs and other drivers as being error-ridden and unreliable for accurately showing drivers' meal and other breaks.  Ex. B, Mingolla Dep. at 181:6-20 (XATANET could tell you where a driver was on any given day, but Garelick Farms would not rely on it to start adding hours back into people's pay); Ex. D, Raposo Dep. at 59:3-60:10 ("[Y]ou can't rely on Xata because it did so many mistakes throughout the day where it wouldn't copy where you were all day.  You would come back and see a whole bunch of papers that they went in and fixed it and wanted you to sign it . . . . It wouldn't record nothing.  It went stupid . . . .  How are they going to know where I was if the Xata showed nothing?  . . . .  It showed some stops, but the hours, the timing were inaccurate because I knew . . . ."), 78:1-11, 86:3-7 (other drivers complained "all the time" that XATANET "didn't work right"); Ex. K, Gill Dec. ¶ 12; Ex. L, Haringa Dec. ¶ 11 (glitch in XATANET caused two months' worth of breaks to not be logged); Ex. N, Marcone Dec. ¶ 12 (has had trouble with XATANET at times).  Also, at least three to four times per week at the Franklin facility, drivers operate rented equipment that is not equipped with XATANET, and therefore are unable to enter any information into XATANET during those times.  Ex. A, Brown Dep. at 64:1-9.

Even Plaintiffs are unable to admit that XATANET data showing that they took 30-minute breaks on certain days was accurate or authentic. Ex. B, Mingolla Dep. at 116:23-118:1 ("I don't have any way of knowing the accuracy or authenticity of what I'm looking at."), 121:4-18 ("I can't really make a determination as to what was going on here. Obviously I don't remember what happened on that particular day. I'm looking at Gulf Express, and I don't know if I was making a delivery there that day or not."), 123:6-124:21 ("I would even have to question the accuracy of a lot of this . . . . So I can't really speak for this information."); Ex. D, Raposo Dep. at 92:2-93:5 ("I don't know if this is actually what I've put in because this is weird. It says break I could have put it in and be working in the back . . . . So I can't recall.").

## ARGUMENT

### I. LEGAL STANDARDS

#### A. Meal and Rest Period Requirements

M.G.L. c. 149 sec. 100 provides that "[n]o person shall be required to work for more than six hours during a calendar day without an interval of at least thirty minutes for a meal." In order to demonstrate an employer's liability to compensate an employee for a missed meal period after six hours of work, an employee must demonstrate that the employer knew or should have known that the employee was *working* during that break. *See Republican Pub. Co. v. American Newspaper Guild*, 172 F. 2d 943, 945 (1st Cir. 1949). Under Massachusetts law, "working time" is defined, in part, as "all time during which an employee is required to be on the employer's premises or to be on duty, or to be at the prescribed work site…" 455 C.M.R. § 2.01. As such, employers do not have to pay employees for breaks so long as the employee is relieved of all work-related duties during that time. *See id.*

### B.    Class Certification Standard

In *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541 (2011), the Supreme Court reiterated that certification of a class is proper "only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied."  131 S. Ct. at 2551, citing *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982) (internal quotations omitted); *see also Sparkle Hill, Inc. v. Interstate Mat Corp.*, 2012 WL 6589258, *1 (D. Mass. Dec. 18, 2012) (in deciding whether to grant or deny class certification, a court "may only certify a class after a 'rigorous analysis of the prerequisites established by Rule 23'") (internal citation omitted).   That is, "[a]ctual, not presumed, conformance with Rule 23(a) remains [ ] indispensable." *Falcon*, 457 U.S. at 460.[6] Under this framework, Plaintiffs fail to meet Rule 23(a)(2) commonality and Rule 23(a)(3) typicality standards.   Nor does Plaintiffs' proposed class satisfy the predominance and superiority requirements of Rule 23(b)(3).

## II.    PLAINTIFFS CANNOT SATISFY ALL OF THE REQUIREMENTS OF RULE 23(a)

### A.    Plaintiffs Fail to Satisfy the Commonality Requirement of Rule 23(a)(2)

Plaintiffs contend that Rule 23(a)(2) commonality is met over "policies and practices that apply equally to the delivery drivers at Garelick's Franklin and Lynn facilities:" 1) Garelick

---

[6] Plaintiffs make the puzzling assertion that they should be allowed to bring claims under the Massachusetts Wage Act on behalf of others regardless of whether they can satisfy Rule 23, analogizing to the more lax standard applied to class claims brought under M.G.L. c. 93A.  Plaintiffs overlook the fact that Chapter 93A contains its own explicit and implicit class certification guidelines.  *See Fletcher v. Cape Cod Gas Co.*, 394 Mass. 595, 605 (1985); *Baldassari v. Pub. Fin. Trust*, 369 Mass. 33, 40 (1975).  The Wage Act imposes no such explicit or implicit requirements, and the "mandatory tone" of Chapter 93A is therefore inapposite to the Wage Act.  Indeed, courts have expressly rejected similar arguments that putative Wage Act class actions are exempt from the province of Rule 23.  *See, e.g., Williamson v. DT Mgmt., Inc.*, 17 Mass. L. Rptr. 606 *15 (Mass. Super. 2004) ("The plaintiffs here argue that in light of the language in Chapter 149, Section 150 permitting class actions, they are exempt from the requirements of Rule 23 and are automatically entitled to class action status.  This Court, however, disagrees with this entitlement argument that is notably lacking in legal support [].").  Accordingly, for their putative class claims to survive, Plaintiffs are required to meet each standard set forth by Rule 23, which they cannot do.

Farms' automatic deduction of a 30-minute meal break from every shift worked, without regard for whether drivers took and recorded on XATANET their full 30-minute breaks; and 2) the restrictions imposed on drivers' breaks, which allegedly resulted in time for which drivers must be compensated.  *(See* Pls.' Mot. for Class Certification and Mem. in Support Thereof [Doc. #49] at 10, 15.)

The Supreme Court has made clear, however, that plaintiffs cannot satisfy the commonality requirement simply by crafting a common question, but must demonstrate the class members have suffered the same injury.  *Dukes*, 131 S. Ct. at 2551.  As further stated in *Dukes*:

> What matters to class certification . . . is not the raising of common "questions" – even in droves – but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.   Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

*Id.* (internal citations omitted) (emphasis in original).  The crux of the inquiry is "the reason for a particular employment decision."  *Id.* at 2552 (internal citation omitted).  "Without some glue holding the alleged reasons for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*."  *Id.* (emphasis in original).  *See also George v. Nat'l. Water Main Cleaning Co.*, 286 F.R.D. 168, 174 (D. Mass. 2012) (the true inquiry is whether there is "'the capacity of a classwide [sic] proceeding to generate common answers apt to drive the resolution of the litigation'") (quoting *Dukes*, 131 S. Ct. at 2551).[7]

Thus, a class cannot be certified based on attorney-crafted questions that would be impossible to answer – *i.e.*, whether all drivers were so "restricted" on any given day that they did not have a free and clear lunch break – especially when the facts contradict such assertions.

---

[7] Notably, all of the cases cited by Plaintiffs in support of their contention that commonality is "easily met" or "usually is satisfied" where a common scheme is alleged (*see* Doc. # 49 at 9-10) were decided prior to *Dukes*.

Here, the record, principally from Plaintiffs' own deposition testimony, demonstrates that the claim that meal periods were actually compensable time are not based on a common contention "capable of classwide resolution" under *Dukes*.

1. **Plaintiffs Fail to Establish Commonality as to Their Claim that Garelick Farms Made Automatic Deductions of Meal Breaks Without Reviewing XATANET Records**

Plaintiffs' theory -- that drivers should be compensated for meal breaks that were automatically deducted from their timekeeping records[8] because Garelick Farms failed to review XATANET records to confirm whether meal breaks had actually been taken – does not lend itself to common analysis.

As an initial matter, Plaintiffs have not framed their common question in terms of the actual elements of a meal and rest period claim under Massachusetts or federal law. This is important because, as the Supreme Court made clear in *Dukes*, commonality is not simply a matter of common questions, "even in droves," but rather, is a matter of whether the class proceeding can generate "common *answers* apt to drive the resolution of the litigation." *Dukes*, 131 S. Ct. at 2551 (emphasis in original). This requires a close scrutiny into the class allegations and in some circumstances, even a consideration of merits questions, to determine whether the lawsuit can generate common answers that are central to the validity of the plaintiffs' claim. *Id.* at 2551-52.

Here, Plaintiffs have cited no Massachusetts or federal authority supporting the proposition that an employer's automatic deduction of a 30-minute meal period violates the Wage Act.[9] To the contrary, it is well settled that Garelick Farms' 30-minute automatic deduction policy is not facially unlawful under the Fair Labor Standards Act ("FLSA"), or by

---

[8] It should be noted that the 30-minute automatic deduction is made from Plaintiffs' timekeeping records, and not their pay.
[9] Nor have Plaintiffs cited any authority for the proposition that such a deduction constitutes unjust enrichment.

analogy, under the Massachusetts Wage Act.  *See, e.g., White v. Baptist Mem. Health Care Corp.*, 699 F.3d 869, 873 (6th Cir. 2012) (affirming denial of class certification in part because "[a]n automatic meal deduction system is lawful under the FLSA"); *Wolman v. Catholic Health Sys. of Long Island*, 853 F. Supp. 2d 290, 301 (E.D.N.Y. 2012), *rev'd in part on other grounds*, 2013 WL 765117 (2d Cir. March 1, 2013)(observing that automatic deduction policy is not facially unlawful); *Dinkel v. MedStar Health, Inc.*, 880 F. Supp. 2d 49, 55 (D.D.C. 2012)(noting that "the bare existence of an auto-deduct policy…is not by itself the least bit unlawful"); *Kuznyetso v. West Penn Allegheny Health Sys., Inc.*, 2011 WL 6372852 *4, fn. 2 (W.D. Penn. December 20, 2011)(observing that a growing consensus of federal courts have recognized that automatic deductions for meal breaks does not violate the FLSA and citing cases).

Further, Plaintiffs have cited no authority holding that an employer that automatically deducts time to account for an employee break is obligated to check or confirm that an employee has taken that break, whether it be by reviewing data maintained by the Company – such as, in this case, XATANET records – or by any other means.  Indeed, while no Massachusetts court has addressed this particular issue, courts in other jurisdictions have expressly held – in the context of the FLSA – that employers that automatically deduct employees' meal breaks are *not* obligated to confirm that employees take those breaks.  *See Deppen v. Detroit Med. Ctr.*, 2011 WL 2847405, at *9 (E.D. Mich. July 19, 2011) (FLSA does not require "employers to ensure that their employees are receiving their meal breaks whenever an automatic deduction for meal breaks is taken").

Plaintiffs' theory that Garelick Farms' failure to review drivers' XATANET records somehow violates the Wage Act is particularly curious in light of the undisputed fact that Garelick Farms policy *mandates* that all employees take a 30-minute break during each shift, and

that as admitted by Plaintiffs, all employees are unequivocally instructed by the Company that they must take their meal breaks.  Moreover, as established by Plaintiffs' own deposition testimony, it is undisputed that the XATANET system used by Garelick Farms is primarily a system used to locate equipment, track delivery routes, track other metrics such as miles per gallon and idling time, and comply with Department of Transportation regulations.  It is not a reliable tool by which to track drivers' breaks or other use of their time, other than the start and end times of each shift.  Indeed, while drivers are encouraged to enter codes for meals and breaks into XATANET "whenever possible," management is aware that drivers do not consistently use such codes.  For these reasons, while management reviews XATANET records for a variety of other reasons, including planning routes and tracking vehicle locations, management does *not* use XATANET for the purpose of tracking drivers' breaks.  In sum, even if Garelick Farms had an obligation to ensure that drivers received their meal breaks (which it does not), XATANET is not used for that purpose, nor would it be a reliable or appropriate means by which to do so.

In light of these facts, the relevant question is not whether Garelick Farms' practice of automatically deducting meal breaks without confirming through XATANET that breaks were taken is a violation of state law, but rather, whether Plaintiffs' and other class members' alleged failure to take meal breaks entitles a class of drivers to compensation for those meal breaks.  The crucial question with respect to this claim therefore becomes whether and *why* Plaintiffs and other drivers worked through all or part of their meal breaks.  *See Dukes*, 131 S. Ct. at 2552 (the crux of the inquiry is "the reason for a particular employment decision."); *see also Boelk v. AT&T Teleholdings, Inc.*, 2013 WL 261265, at *12 (W.D. Wis. Jan. 10, 2013) (where plaintiffs claimed that they were caused to work during their unpaid meal breaks without reporting their time, the crucial question with respect to that claim was *why* plaintiffs worked through their

breaks without reporting their doing so).  Plaintiffs have failed to show that this question can be resolved on a classwide basis.

Indeed, it is clear from the deposition testimony of Plaintiffs and declarations from other drivers that some drivers worked through their breaks while others did not.  Of those who at least occasionally worked through their breaks, the reasons for doing so varied not just between the Franklin and Lynn facilities, but from driver to driver and even from day to day.  Whether workers decided to work through meal breaks depended on the facility they worked out of, the day, the volume of work, the length of the route, the types of deliveries on the route, supervisors' varying expectations and the driver's individual needs and desires.  *See supra* at pp. 6-7.

Accordingly, determining whether drivers worked through a meal break, and if so, the reasons why, is a fact-laden inquiry not capable of classwide resolution.  *See Boelk*, 2013 WL 261265, at *12 (whether putative class members took proper breaks depended on several variables, including the day, volume of work, route, supervisor and the technician's individual needs and desires); *Gonzalez v. Officemax North America*, 2012 WL 5473764, at *4 (C.D. Cal. Nov. 5, 2012)("Since [the employer] is liable only for missed meal periods that it forced the Employees to forgo, the reason that any particular employee missed any particular break requires, ineluctably, individualized fact finding."); *York v. Starbucks Corp.*, 2011 WL 8199987, at *27 (C.D. Cal. Nov. 23, 2011) (no common answer to the "why" question under *Dukes* precludes Rule 23(a)(2) commonality on denied meal break claims, as "whether an employee took a proper meal break depended on who was running the shift . . . which indicates that violations resulted from individual action and not a corporate-wide policy or practice . . . . [A]n evaluation of a meal break claim as to any individual would involve a variety of particularized factors that would not necessarily impact any other company employee."); *Jonites v. Exelon*

17

*Corp.*, 522 F.3d 721, 725-27 (7th Cir. 2008) (rejecting as "preposterous" the argument that because some employees may sometimes do some work at lunch, all employees are entitled to pay during their lunch break).

In addition, Plaintiffs appear to assert that the issue of Garelick Farms' knowledge of drivers' missed breaks is susceptible to class treatment by virtue of the fact that Garelick allegedly could have used XATANET to track whether drivers had taken their meal breaks. This contention also fails, however, as there could be no common answer as to whether any particular supervisor on a given day knew or should have known if a driver chose to skip or shave time from a meal period and misrepresent his hours in XATANET in express derogation of company policy. Indeed, the crucial question here becomes whether drivers logged their breaks into XATANET correctly, and if they did not do so, *why* they did not do so. Just as drivers had widely varying reasons for why they did or did not take meal breaks, whether and how drivers recorded their activities in XATANET depended on the facility they worked out of, the day, the volume of work, the length of the route, the types of deliveries on the route, supervisors' varying expectations and the driver's individual needs and desires. For instance, the evidence shows that based on all of these factors, drivers who took a meal break might have entered time into the XATANET system as "break," or as "lunch," or they may have failed to enter any information at all. While drivers who did not take a meal break, might have entered time into XATANET as "break," some other category, or failed to enter any information at all. In other words, the record illustrates that management knowledge of alleged off-the-clock work – in particular through review of XATANET records – is an individualized issue.[10]

---

[10] Moreover, the record demonstrates that for purposes of tracking meal periods and breaks, XATANET records are inherently unreliable, as drivers often do not log their breaks, log them improperly, or log breaks for time not spent on breaks. The record also demonstrates that XATANET frequently malfunctions.

In sum, these differences make it impossible to generate common answers on a classwide basis. This is particularly true where, as here, the differences arise because of variations in supervisor discretion. This supervisor discretion – particularly when spread across multiple job sites and locations – precludes Rule 23(a)(2) commonality under Dukes and its progeny. *See, e.g., Bolden v. Walsh Const. Co.*, 688 F.3d 893, 893 (7th Cir. 2012) ("[W]hen multiple managers exercise independent discretion, conditions at different stores (or sites) do not present a common question."); *Vang v. Kohler Co.*, 488 Fed. Appx. 146 (7th Cir. 2012) (vacating and remanding wage and hour class certification decision to determine whether suit concerned one firm-wide policy or "congeries of supervisor-level practices").

### 2. Plaintiffs Fail to Establish Commonality as to Their Claim that Restrictions on Drivers' Time Rendered that Time Working Time

Plaintiffs' second theory – that a driver who was on break and not performing job duties should, nonetheless, be compensated for that time because of supposed restrictions on his meal breaks – also does not lend itself to common analysis. Again, however, Plaintiffs have not framed their common question in terms of the actual elements of a claim under Massachusetts or federal law. Under Massachusetts law, employers must pay their employees for all time worked, which means "all time during which an employee is required to be on the employer's premises or to be on duty, or to be at the prescribed work site, and any time worked before or beyond the end of the normal shift to complete the work. Working time does not include meal times during which an employee is relieved of all work-related duties." 455 CMR 2.01 (defining "working time").[11] In other words, employers do not have to pay employees for breaks so long as the employee is relieved of all work-related duties during that time. *See id.*

---

[11] Plaintiffs' attempt to conflate the definition of "working time" in 455 CMR 2.01 with the definition of "off duty" under Department of Transportation ("DOT") safety rules (*see* Doc. #49 at 15, fn. 8), is unavailing and misguided at best. The DOT regulations pointed to by Plaintiffs are not wage and hour rules, but *safety* regulations, based on the

Plaintiffs' theorize that their mandatory meal breaks were in fact "working time" because of the supposed restrictions that Garelick Farms placed on where drivers could go, or what they could do, during their breaks.  (Doc. # 49 at 10, 15.)  Specifically, Plaintiffs contend that because they were prohibited from driving more than five to ten miles from their route and were expected to *try* to keep their trucks in sight during their breaks,[12] such restrictions rendered their breaks compensable work time.

Plaintiffs, however, have cited nothing in Massachusetts or federal law supporting the proposition that employers must pay employees for meal breaks simply because the employee is restricted in what he can do during the break, regardless of whether the employees are performing work for the employer.[13]  Under Plaintiffs' theory, they should be paid, even if they are spending their break by sitting in their trucks eating, reading and relaxing, because Garelick Farms' restrictions prohibit them from going more than ten miles off their route or into an establishment where they cannot keep their truck "in sight."  However, the law requires only that employees be compensated for "working time."  Plaintiffs' so-called common question therefore does not state a claim.

Even if Plaintiffs' claim regarding restrictions on breaks were valid, (which it is not), the question of whether any restriction on meal breaks results in "working time" is inherently contextual and thus cannot be resolved on a classwide basis.  The evidence in the record, including Plaintiffs' own deposition testimony, shows that whether any meal break restriction

---

amount of time a driver can be awake and work yet still operate a motor vehicle safely.  DOT safety rules have no place in wage and hour matters or any other non-DOT matters.  *See, e.g., McGinnis v. Arco Pipe Line Co.*, 189 Fed. Appx. 314, 316 (5th Cir. 2006) (declining to use the "on-duty time" definition of 49 C.F.R. § 395.2 to interpret entitlement to death benefits because the DOT safety regulations were not intended for that purpose).

[12] Notably, only the Franklin facility asks its drivers to *try* to comply with this guideline; the Lynn facility does *not* ask drivers to try to keep vehicles in sight.

[13] Nor have Plaintiffs cited any authority for the proposition that such restrictions would cause compensation to be due to Plaintiffs under an unjust enrichment theory.

foreclosed a driver's use of his break depended on the circumstances.  Whether the restriction on driving off route for lunch would result in not being able to stop at a restaurant or fast food establishment for 30 minutes depended on the facility out of which the driver worked, the particular day, the volume of work, the job assignment and route (*e.g.*, more urban locations have more food options, or a tractor trailer driver might stop at a rest area on the highway), a particular supervisor and the driver's individual needs and desires.  Whether the guideline that drivers *try* to keep their vehicles in sight when parked for meals would result in not being able to stop for 30 minutes also depends on the facility out of which the driver worked (*e.g.* the Lynn facility did not even have such a policy), the particular day, the volume of work, the job assignment and route, a particular supervisor and the driver's individual needs and desires, including the measures that a particular supervisor and/or driver believed were necessary to "try" to keep the driver's truck in sight.

These differences make it impossible to generate common answers on a classwide basis.  As explained above, this is particularly true where, as here, the differences arise because of variations in supervisor discretion (*e.g.*, different supervisors communicated and had different expectations regarding what was considered to be "off-route" or whether drivers had to try to keep company vehicles in sight).  Moreover, as discussed above, the evidence in the record shows that during their breaks, drivers were able to leave their trucks, or stay in their trucks and eat, read, make personal calls on their cell phones, or just relax.  It can hardly be said then that the Court can decide in "one stroke" whether any meal break restrictions render lunch breaks "working time" across the putative class.

###### 3.     The Authority Cited by Plaintiffs Does Not Support Commonality in this Case

Plaintiffs essentially base their commonality argument on their contention that "[w]hen all employees are subject to a common employment practice, the commonality requirement is satisfied." (Doc. #49 at 10.)  It is true that courts frequently conclude that class treatment is appropriate in cases in which plaintiffs challenge company-wide policies that result in violations of the law.  It is *not* true, however, that simply through the existence of a common employment practice, plaintiffs can automatically satisfy the commonality requirement of Rule 23(a)(2), particularly after *Dukes*.  *See Wang v. Chinese Daily News*, 709 F.3d 829, 835 (9th Cir. 2013)(remanding case where district court improperly created a "`presumption that class certification is proper when an employer's … policies are applied uniformly to the employees'" because such a presumption "`disregards the existence of other potential individual issues that may make class treatment difficult if not impossible.'")(internal citations omitted).  Indeed, neither of the two cases relied upon by Plaintiffs in their Motion, *McLaughlin v. Liberty Mutual Insurance Co.*, 224 F.R.D. 304 (D. Mass. 2004) and *Wren v. RGIS Inventory Specialists*, 256 F.R.D. 180 (N.D. Cal. 2009), hold that a plaintiff may satisfy Rule 23(a)(2) simply by alleging a common employment practice.  *See McLaughlin*, 224 F.R.D. at 309 (finding common question where policy at issue was company-wide classification of class members' job positions as exempt); *Wren*, 256 F.R.D. at 204 (concluding that plaintiffs' meal break claims did *not* meet the predominance requirement of Rule 23(b)(3), *without deciding* whether such claims met the commonality requirement of Rule 23(a)(2)).

Further, the case at bar is not a case where Plaintiffs challenge uniform policies that are uniformly applied company-wide.  Instead, the evidence shows that policies varied by facility.  Local supervisors had significant discretion in the enforcement of meal break restrictions, and

drivers themselves varied significantly as to whether and how they followed company policies or practices. Thus, Plaintiffs have failed to show that there are common questions that could be resolved on a classwide basis using common proof. *See Gonzalez v. Millard Mall Servs., Inc.*, 281 F.R.D. 455, 463 (S.D. Cal. 2012) (district courts "den[y] class certification where a plaintiff has failed to show common proof that its employer prevented the putative class from taking required breaks"); *Brown v. Federal Express Corp.*, 249 F.R.D. 580, 587 (C.D. Cal. 2008) (plaintiffs showed no method of common proof to establish that defendant's policies prevented putative class from taking required breaks); *Espenscheid v. DirectSat USA, LLC*, 2011 WL 2009967, at *5 (W.D. Wis. May 23, 2011) (decertifying Rule 23 class action and FLSA collective action because "proof of plaintiffs' claims depends on how individual technicians responded to the numerous policies and practices at issue in this case" and "the evidence shows that opt-in plaintiffs and class members have different work experiences and were affected by defendants' policies in different ways").

### B.      Plaintiffs Fail to Satisfy the Typicality Requirement of Rule 23(a)(3)

Plaintiffs' entire argument for satisfying Rule 23(a)(3) is that because they were both subject to Garelick Farms' automatic 30-minute meal break deduction without regard for whether they took their breaks, "their claims are typical of the class claims." (Doc. #49 at 11.) This is insufficient to meet Plaintiffs' burden to show that their claims "arise from the same event or pattern or practice" that gives rise to the claims of other putative class members. *See In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 69 (D. Mass. 2005).

Initially, whether the "claims or defenses of the representative parties are typical of the claims or defenses of the class" under Rule 23(a)(3) is "closely related" to the Rule 23(a)(2) commonality inquiry, and the two requirements "tend to merge." *Falcon*, 457 U.S. at 157 n. 13.

For the same reasons that Plaintiffs fail to satisfy Rule 23(a)(2), the Court should find likewise with respect to Rule 23(a)(3).

There are several independent reasons though why Plaintiffs cannot show, as required under Rule 23(a)(3), enough "congruence between particular claims of the named class representatives and the generalized claims that are common to the class" to justify allowing the named party to litigate on behalf of the group.  *See Payne v. Goodyear Tire & Rubber Co.* 216 F.R.D. 21, 26 (D. Mass. 2003).  For example:

- Both Plaintiffs worked out of the Franklin facility, never out of the Lynn facility, yet purport to represent putative class members working at the Lynn facility – which had different policies, procedures and management than did the Franklin facility.

- Plaintiffs claim that their breaks were restricted by having to try to keep their vehicle "in sight," yet drivers at the Lynn facility were not subject to such a policy.

- Plaintiffs claim that they entered break codes into XATANET because of instructions from their supervisors that delay codes should be entered if a truck was stopped, yet drivers at the Lynn facility were not given such instructions by their supervisors.

- Plaintiffs have testified that they do not believe XATANET was reliable, yet purport to represent putative class members based on the claim that Garelick Farms should have paid drivers according to XATANET records.

- Plaintiff Mingolla's claims hardly are typical when he has testified that his personal preference was not to eat a meal during the course of his work day.

Taken together, these varied experiences demonstrate that the named Plaintiffs' claims necessarily do not have the same "essential characteristics" as the claims of the rest of the putative class.  *See Payne*, 216 F.R.D. at 26.

### C.        Plaintiffs Fail to Satisfy the Adequacy Requirement of Rule 23(a)(4)

The final element articulated by Rule 23(a) requires that the proposed class representatives "fairly and adequately protect the interests of the class."  Fed R. Civ. P. 23(a)(4). This requirement has two parts: "The moving party must show first that the interests of the

representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985). Here, the named Plaintiffs are unable to show that their interests do not conflict with the interests of other class members and that they can adequately represent all members of the putative class.

First, despite purporting to bring claims on behalf of drivers working out of Garelick Farms' facilities in both Franklin, MA and Lynn, MA, it is undisputed that neither named Plaintiff to this action ever worked at, or has any knowledge regarding, the Lynn facility. It also is undisputed that the Lynn facility has different policies, procedures and management than does the Franklin facility. The named Plaintiffs cannot adequately represent drivers who worked out of the Lynn facility, and who were subject to completely different work rules, conditions and treatment than were the named Plaintiffs.

In addition, named Plaintiff Mingolla purports to represent a class of drivers through September 2011, even though he was a driver only until January 2011, at which time he became a supervisor working out of Garelick Farms' Franklin, MA facility. As a supervisor during part of the purported class period, Mingolla not only was not a member of the class he seeks to represent (and for that reason alone cannot adequately represent the class), but was in a position whose interests directly conflicted with the interests of other putative class members. Specifically, as a class representative, Mingolla alleges that Garelick Farms management (including supervisors) did not take into regard whether drivers actually took and recorded on XATANET their full 30-minute breaks, and imposed various restrictions on drivers' breaks; if such allegations were true, as a supervisor himself, Mingolla would have been part of the

management team which allegedly disregarded data showing whether putative class members took their 30-minute breaks and imposed the restrictions at issue.  The inclusion of a supervisor in a proposed class such as this one creates a potential conflict of interest and accordingly, results in inadequate representation.  *See, e.g. Hadjavi v. CVS Pharm., Inc.*, 2011 WL 3240763, at *6 (C.D. Cal. July 25, 2011) (finding that a supervisor was an inadequate representative for other non-supervisor employees in a putative class action where supervisors were alleged to have contributed to other employees' inability to take meal breaks); *Wagner v. Taylor*, 836 F.2d 578, 595 (D.C. Cir. 1987) ("Supervisory employees are often inappropriate representatives of nonsupervisory employees because the structure of the workplace tends to cultivate distinctly different interests between the two groups.").

## III.   PLAINTIFFS CANNOT SATISFY THE REQUIREMENTS OF RULE 23(b)(3)

Plaintiffs' proposed class allegations cannot meet the rigorous 23(b)(3) requirements that "questions of law or fact common to the class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Individualized issues in this case overwhelm any analysis of the class claims, and adjudication of this case as a class would be anything but manageable.

### A.   Individualized Issues Would Predominate Over Any Analysis of Class Claims

If Plaintiffs cannot satisfy commonality under Rule 23(a)(2), then they cannot satisfy predominance under Rule 23(b)(3).  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997) (Rule 23(b)(3)'s "predominance criterion is far more demanding" than the Rule 23(a)(2) commonality standard); *Manson v. GMAC Mortg., LLC*, 283 F.R.D. 30, 41 (D. Mass. 2012) (because plaintiffs did not meet the test for commonality, the common issues of law "almost by

definition do not predominate over the individualized ones").  *See also Boelk*, 2013 WL 261265,

at *12 (unnecessary to address predominance under Rule 23(b) where plaintiffs could not satisfy

the commonality requirement of Rule 23(a)(2)).  Further, predominance will be found only if

Plaintiffs are able to challenge a policy or practice without depending on heavily individualized

evidence.  *See Kent v. SunAmerica Life Ins. Co.,* 190 F.R.D. 271, 280 (D. Mass. 2000) (common

questions, let alone a finding of predominance, are "hard to find in such a grab-bag of

individualized factual findings"); *Harris v. Initial Sec., Inc.*, 2007 WL 703868, at *7 (S.D.N.Y.

Mar. 7, 2007) (class certification held to be inappropriate because each individual claim would

have its own provable set of facts and measure of damages).  Predominance does not exist where

a Rule 23(b)(3) class would eventually "degenerate in practice into multiple lawsuits separately

tried."  Fed. R. Civ. P. 23(b)(3), Advisory Comm. Notes to 1966 Amendments.

     Here, for the same reasons that Plaintiffs cannot establish commonality, they similarly

cannot show that common questions of law and fact predominate because of the myriad

individualized assessments necessary to prove liability on the part of each class member.  Taking

just some of the named Plaintiffs' allegations as examples, these highly individualized

assessments include, *for each Plaintiff*, and *for each day* worked:

- Whether the Plaintiff took a full 30-minute meal break on that day, and if not, the reason(s) why not;

- If the Plaintiff did not take a full 30-minute meal break, what his routes and stops were, how many hours his shift lasted, and what he was told by supervisors;

- If the Plaintiff did not take a full 30-minute meal break, whether Garelick knew he had missed a meal break and failed to pay him, or whether he nevertheless logged the code for meal break into XATANET or otherwise failed to report that he had not taken his break;

- If Plaintiff did not take a full 30-minute meal break, how much time within the meal break was missed;

- If Plaintiff did take a meal break, whether he was restricted from taking a break as he wished because he could not go more than a certain distance off route, including what his particular route was that day;

- If Plaintiff did take a meal break, whether he was restricted from taking a break as he wished because he was trying to keep his vehicle in sight;

- If Plaintiff did take a meal break, whether he logged the code for meal breaks into XATANET, logged in a different code, or forgot to log in a code.

As demonstrated by the above, consideration of only the two named Plaintiffs' claims will prove a challenge; in the class context, these individual issues would be replicated across the claims of hundreds of putative class members – requiring hundreds of mini-trials – and would require resolution of an exponentially larger number of additional individual questions not susceptible to common proof.  Plaintiffs therefore cannot maintain this action under Rule 23(b). *See, e.g., Kenny v. Supercuts, Inc.*, 252 F.R.D. 641, 646 (N.D. Cal. 2008) (denying class certification because individual issues would predominate as court would need to determine why each class member did not clock out for meal break on any particular day); *Salazar v. Avis Budget Group, Inc.*, 251 F.R.D. 529, 534 (S.D. Cal. 2008) (denying class certification because individual issues would predominate in determining whether defendants forced plaintiffs to forgo missed meal periods).

Moreover, the Supreme Court's recent decision in *Comcast Corp. v. Behrend*, 2013 WL 1222646 (S. Ct. Mar. 27, 2013) – holding that Rule 23(b)(3) certification as to the predominance criterion is inappropriate where damages cannot be measured classwide – also dictates against a finding that Plaintiffs have satisfied Rule 23(b)(3) predominance in this case.  *Id.* at *5 (where plaintiffs could not establish that damages were capable of measurement on a classwide basis, "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class").   Here, Plaintiffs' alleged damages are highly individualized and cannot be

determined on a classwide basis, making certification under Rule 23(b)(3) inappropriate under the Supreme Court's holding in *Comcast*.  Indeed, as explained above, each putative class member in this case would have his own provable measure of damages depending on numerous factors, including but not limited to the facility at which he worked, the route he drove, the supervisor(s) who directed his work, whether and how often he took full 30-minute meal breaks, his personal habits and circumstances, the length of time he was employed by Garelick Farms, and his particular hourly wage.

Plaintiffs have offered no argument or evidence (much less admissible evidence) to show that class members' respective damages are anything but individualized, or how damages could possibly be determined on a classwide basis.  *See Roach v. T.L. Cannon Corp.*, 2013 WL 1316452 (N.D.N.Y. March 29, 2012)(finding plaintiffs' failure to offer a damages model that was "susceptible of measurement across the entire class" was fatal to class certification in FLSA and state wage and hour class action).[14]  Further, to the extent Plaintiffs argue that they can use XATANET records to measure damages on a classwide basis, such an argument is fatally flawed in that, as shown above and as admitted by Plaintiffs, XATANET data is inherently unreliable, does not accurately show drivers' meals and other breaks, and is not intended or used as a method for measuring drivers' meal or break time.

### 2. A Class Action Is Not Superior to Other Methods for Litigating This Case and Would Be Unmanageable

A class action is not superior to other available methods where – as here – individualized proof is required to prove each plaintiff's claims and damages.  *See Ruggles v. Wellpoint, Inc.*,

---

[14] While the court in *Martins v. 3PD, Inc.*, 2013 WL 1320454 at *3 (Mar. 28, 2013) has interpreted the *Comcast* ruling not to foreclose the possibility of class certification where some individual issues over the calculation of damages might remain which "will neither be particularly complicated nor overwhelmingly numerous," such is not the situation in this case.  Here, as in *Comcast*, the permutations involving different theories of liability and hundreds of drivers working out of two different facilities "are nearly endless." *See Comcast*, 2013 WL 1222646, at *6.

272 F.R.D. 320, 341 (N.D.N.Y. 2011) (class action not superior mechanism for adjudicating plaintiffs' claims because individualized proof necessary to determine correctness of defendant's actions).  In addition, to evaluate superiority, a court must consider, *inter alia*, the manageability of a class action.  *Otte ex rel. Estate of Reynolds v. Life Ins. Co. of N. Am.*, 275 F.R.D. 50, 58 (D. Mass. 2011) (citing Fed. R. Civ. P. 23(b)(3)).  Here, there is no conceivable way that this action – or any part of it – could be efficiently and manageably tried.

Indeed, Plaintiffs have given this Court no reason to believe that this case could be prudently managed as a class on the principal issue of liability, let alone the issue of damages. For each Plaintiff and putative class member, the Court would have to determine whether the driver took a full 30-minute meal break on a particular day despite the absence of such entries in the XATANET records, or if not, how many minutes of the meal break the driver did take. Then, the Court would still need to consider *why* drivers did not did not get their full break, whether they nonetheless entered the code for meal break or another break code into XATANET, and whether they made any effort to make their supervisor aware that they violated company policy by not taking a full meal break.  In addition, no piece of data – including the much-hyped XATANET records – will ever be able to tell the Court whether a driver, for example, actually took a break that was logged in XATANET, or if he did take such a break, whether he was supposedly restricted in how he could take that break.  Indeed, as explained above, even if the Court were to undergo the painstaking process of reviewing XATANET records on *every single day* for *every putative class member*, that exercise would not be sufficient to tell whether the driver nonetheless was "working."  Consequently, to determine whether Plaintiffs are owed compensation for any alleged unpaid meal breaks, there would be nothing to substitute for day-

to-day, case-by-case inquiries for hundreds of putative class members.  For all of these reasons, certification under Rule 23(b)(3) is improper as a matter of law.

## CONCLUSION

For the foregoing reasons, Defendant Garelick Farms respectfully requests that the Court deny Plaintiffs' Motion for Class Certification in its entirety, and grant such other and further relief as the Court deems proper.

Respectfully submitted,

GARELICK FARMS, LLC,
By its attorneys,

/s/ Diane M. Saunders
Diane M. Saunders, BBO# 562872
Damon P. Hart, BBO# 644586
Rachel Reingold Mandel, BBO# 660495
Julia M. Brumer, BBO# 676722
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
One Boston Place, Suite 3220
Boston, MA 02108
Telephone:  617.994.5700
Facsimile:  617.994.5701
diane.saunders@ogletreedeakins.com
damon.hart@ogletreedeakins.com
rachel.mandel@ogletreedeakins.com
julia.brumer@ogletreedeakins.com

Dated:  April 8, 2013

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent via First Class Mail to those indicated as non-registered participants on April 8, 2013.

/s/ Diane M. Saunders
Diane M. Saunders, BBO# 562872

14743963.1